Filed 4/28/25  P. v. Borbon CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>CARLOS MARTIN BORBON,<br><br>　　　Defendant and Appellant. | B337521<br><br>Los Angeles County<br>Super. Ct. No. BA504125 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gustavo N. Sztraicher, Judge.  Affirmed as modified.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, and Scott A. Taryle and Lauren N. Guber, Supervising Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Carlos Martin Borbon of first-degree murder. Borbon appeals this conviction, arguing the trial court prejudicially erred in giving an unwarranted jury instruction. Borbon also asserts the court erred in failing to grant him presentence custody credits. The prosecutor agrees that Borbon is entitled to presentence custody credits, and agrees the trial court erred in giving the disputed jury instruction, but argues this error was harmless.

We affirm the judgment because the jury instruction error indeed was harmless. But we modify the judgment to include 744 days of actual presentence custody. Citations are to the Penal Code.

I

We recount facts.

A

As of March 2022, Borbon worked at an auto glass shop on Alameda Street in Los Angeles owned by Jose Garibay. At the shop, Borbon worked on cars as a handyman and as the nighttime security guard. Borbon also installed a DVR-based surveillance video system at the shop.

Garibay considered Borbon his friend, not just his employee. He allowed Borbon to live in a room in the back of the shop's office and gave Borbon keys to the gate of the shop.

Garibay also let another of his employees, Juan Mendieta, stay at the shop after hours. Mendieta was a frequent user of methamphetamine and alcohol, and would sometimes leave town for days at a time. When he worked at Garibay's shop, Mendieta would sleep in his car in the shop's parking lot. Garibay described Mendieta as "bipolar," meaning "sometimes he was good and sometimes he was not good." Although Garibay had

2

once given Mendieta the keys to the shop, he took the keys back from Mendieta at some point before March 2022.

On March 3, 2022, Borbon was working on the surveillance video system because he wanted to be able to see the video feed on the television in his room. When Garibay left at 6:00 or 7:00 p.m. at the end of the workday, both Mendieta and Borbon were still at the shop. That would be the last time that Garibay ever saw Mendieta alive.

B

A little after 6:00 a.m. on March 4, 2022, LAPD Officer Isaias Medrano responded to a 911 call about a dead body found near 3051 Washington Boulevard. When Medrano arrived, he observed the body of a deceased man wrapped in a blanket on the sidewalk. There was also a large amount of trash and debris near the body.

The County Medical Examiner sent an investigator to examine the body and transport it for an autopsy at the coroner's office. From his fingerprints, the investigator identified the deceased man as Mendieta.

Dr. Raffi Djabourian conducted the autopsy of Mendieta. During the autopsy, Djabourian saw an entry and exit gunshot wound on Mendieta's left forearm, and an entry wound near the middle of his chest. Djabourian ruled the death a homicide. Mendieta's blood showed he had recently consumed alcohol and methamphetamine, but Djabourian did not believe the alcohol and methamphetamine contributed to Mendieta's death.

Mendieta's stomach contained minimally digested food. Djabourian estimated Mendieta had probably been killed less than half an hour after he had eaten.

3

C

LAPD Detectives John Meneses and Brad Golden were the lead investigating officers of Mendieta's death. The morning Mendieta's body was discovered, they met with LAPD Video Intelligence Officer Kenneth Ahn, hoping to find nearby video showing what happened. At that point, there were no leads or suspects in the investigation. All they knew was an unknown person at an unknown time left Mendieta's body on the street.

The area around 3051 Washington Boulevard has a lot of businesses and warehouses. Ahn got footage from about 24 different nearby cameras.

Across the street there was a warehouse with cameras. Ahn's team downloaded footage starting at around 9:30 p.m. on March 3 through March 4 at around 6:30 a.m.

The footage showed that around 4:17 a.m. on March 4, a car pulled up to the sidewalk at 3051 Washington Boulevard. The car's lights went off and then, a few minutes later, the brake lights turned on, the left turn signal blinked, and the car went west along Washington Boulevard. It looked like Mendieta's body was dumped around 4:18 to 4:20 a.m.

A different camera from the same warehouse recorded the same car doing a U-turn along Washington Boulevard and then stopping by the curb where Mendieta's body was found.

This car, a red Toyota Camry, became a "vehicle of interest" in the investigation.

D

Meneses and Golden learned the last place Mendieta worked was Garibay's auto glass shop. The shop was about a 16-minute drive from 3051 Washington Boulevard during normal

4

business hours with traffic. However, driving this route in the middle of the night might take less than 16 minutes.

On March 7, 2022, Golden and Meneses went to Garibay's shop to figure out the timeline of Mendieta's death. When they arrived, they spoke with Garibay and Borbon. Garibay and Borbon both confirmed they knew Mendieta, and said Mendieta worked and stayed at the shop, on an on-and-off basis.

Golden asked Borbon when he had last seen Mendieta, and Borbon responded that it was around 6:00 p.m. on March 3.

Golden asked to see the shop's DVR footage from the night of March 3 and watched it alongside Garibay and Borbon. Borbon said the DVR video system had an issue that night, but he was able to pull up some footage. Some of the footage showed Borbon, wearing a blue hat, blue jacket, and tan pants, walking around. Borbon identified himself in the video while the officers were watching it.

The footage cut out around 8:30 p.m., turned back on around 9:25 pm, and ran for a few more minutes. In those few minutes, the video showed Mendieta entering the shop's outer gates and walking towards the office. Golden could tell it was Mendieta in the video because he was wearing the same clothing he was found in on March 4, and because Garibay and Borbon both identified him. The video then cut out after briefly displaying Mendieta walking towards the office. There was no more footage until about 6:30 a.m. on March 4. Golden thought the gap in the video feed was suspicious.

Golden took the shop's DVR system to Brian Howard, a surveillance specialist in the LAPD Technical Investigation Division Electronics Unit. When Howard examined the DVR data, he could tell there was a gap in the surveillance footage; the

data appeared to reflect an abnormal shutdown of the DVR system.  The shutdown could have been caused by a power outage or someone manually turning off the DVR.

Nonetheless, Howard was able to extract some data from the DVR machine that showed a few more minutes of footage that no one had seen before, starting a little after 9:25 p.m. on March 3.  This extra footage showed Borbon walking around the shop, removing a handgun from his jacket pocket, placing the gun in his rear waistband, and then walking up to the office window.  He was wearing black latex gloves.

E

Meanwhile, Ahn began to look for footage of Mendieta leaving Garibay's auto shop.

Ahn got some surveillance footage from the upholstery business next door from around 9:00 p.m. on March 3 through 6:00 a.m. on March 4.  One camera recorded a clear view of the shop's parking lot.  This footage showed that, starting around 3:21 a.m. on March 4, a car came into the shop's parking lot, parked for a few minutes, repositioned a little further from the shop, and then left the parking lot, making a left onto Alameda Street at about 4:06 a.m.

The car pulled into the auto shop about an hour before Mendieta's body was dumped at 3051 Washington Boulevard.

F

A few days into the investigation, Officer Adolfo Pacheco became involved in the video surveillance review with Ahn.  Ahn had told Pacheco about a red Camry traveling westbound on Washington Boulevard towards Alameda Street in the early morning on March 4.  Along this route was a Shell gas station located on East Florence Avenue.  Pacheco pulled the gas

station's surveillance footage from between 4:00 a.m. and 5:00 a.m. on March 4.

This footage showed the red Camry drive into the gas station at around 4:30 a.m.  Then a masked man got out of the passenger's side of the car, walked up to the gas station attendant's window, made a purchase, took off gloves, threw these gloves away, and walked back to the car.  A woman got out of the driver's side and stood in front of the car.

Pacheco showed this footage to Golden, who believed Borbon was the man in the red Camry.  He could tell based on the man's clothing, which was the same Borbon had been wearing in the March 3 footage from the shop: the same blue hat, blue jacket, and tan pants.

G

On March 24, the police searched Garibay's auto shop and arrested Borbon.  In their initial search of the premises, they were unable to find any evidence relating to Mendieta's death.  Golden found a BB gun in Borbon's room, but did not believe the BB gun was the murder weapon.

That same day, when Golden got to the shop, he saw a red Camry driving southbound on Alameda.  He and another officer followed the Camry and confronted the people inside.   The person driving the car was a man who went by the nickname "Chino."  The other person in the car was Chino's girlfriend Erika Hurtado.  Hurtado resembled the woman in the Shell gas station footage.

The police took Chino and Hurtado to the police station, where Golden interviewed Hurtado.  Hurtado knew Borbon as "a friend of a friend."  She had been to Garibay's auto glass shop because her friend "used to hang out there a lot."  According to

Hurtado, in the early morning of March 4, 2022, she drove to the shop and spoke to Borbon through the gate. Borbon asked Hurtado for a ride, and she told him that she would do it after dropping off her kids, who were in the car with her.

Hurtado left to drop her kids off, came back around 15 minutes later, and entered the shop's parking lot. Borbon opened the gate for her. Hurtado parked her car, left her keys in the ignition, and saw something on the ground in the parking lot. She did not know what it was, but estimated it to be about five to six feet long. Then she went into the shop's office, where she played games on her phone while she waited for Borbon to be ready. Borbon was going in and out of the office while Hurtado was there, but she was not paying him much attention. Hurtado did not see anyone at the shop besides Borbon.

When Borbon was ready to leave, Hurtado went back to her car. She noticed her car was a little further away from the office than where she had parked it. When she got in her car, she saw that the long object that was on the ground was now in her back seat. Hurtado did not ask Borbon what it was.

Hurtado drove Borbon to Washington Boulevard at his direction. When they were on Washington Boulevard, Borbon told her to stop. When she stopped, Borbon took whatever was in the backseat out of the car. Hurtado did not see what he did with the object.

After Borbon got back in the car, Hurtado drove them to a Shell gas station on Florence Avenue. At the gas station, Borbon bought Hurtado a soda. Then, Hurtado drove Borbon back to Garibay's shop.

## H

A June 2023 information charged Borbon with murder, in violation of section 187(a).  It further alleged Borbon personally used a semi-automatic handgun in the commission of the murder, under section 12022.5(a).

Borbon pleaded not guilty.

The court held a jury trial in February 2024.  Medrano, Garibay, Ahn, Pacheco, Howard, Djabourian, Golden, and Hurtado testified for the prosecution.  In exchange for her testimony, Hurtado received use immunity from the prosecution.  Hurtado also admitted to being a frequent user of methamphetamine and having prior convictions for petty theft, hit-and-run, and a DUI.  While she admitted to using methamphetamine in the early morning of March 4, she denied that using methamphetamine would affect her ability to remember events.

Borbon testified on his own behalf.  He testified that on March 3, he was at Garibay's shop with Mendieta.  Mendieta, according to Borbon, "was on drugs that day . . . dancing around, talking out loud . . . [and being] silly or crazy."  Borbon denied having issues with Mendieta that day.  Borbon testified that Mendieta ate dinner in the office, and then left the shop.

Borbon stated that, after Mendieta left, he continued his work on the shop video system.  He testified Garibay had given him permission to turn off the DVR system that night for this work.

When his attorney asked about the surveillance footage showing him with a handgun, Borbon claimed it to be his BB gun, not a handgun.  He said he used the BB gun to "scare people off." Borbon denied owning a real gun.

Borbon admitted seeing Hurtado that night. He texted her and she came to the shop. According to Borbon, he invited Hurtado to go to a "tap house," which is an illegal casino. Borbon estimated they left for a tap house at around 1:00 a.m. He testified that they went to multiple tap houses that night before Hurtado dropped him off at around 3:00 a.m.

When his attorney asked about the surveillance footage from the Shell gas station, Borbon denied it was him in the video. The man in the video had a mask, Borbon pointed out, and he never wore masks because they suffocated him. He also pointed out that the man in the video had blue gloves, which he never had, and that the gloves he was wearing in the video from the shop showed him wearing black gloves.

On cross-examination, the prosecutor asked Borbon why he had previously admitted to being the man in the Shell gas station surveillance video. Borbon explained that was a mistake, and he confused that video with another time he had gone to the same Shell gas station with Hurtado.

When his attorney asked about Hurtado's testimony, Borbon denied placing a five or six-foot object in her car, and denied asking her to drive him to 3051 Washington Boulevard. He claimed to be "completely baffled" by Hurtado's testimony and denied any involvement with Mendieta's death.

At the prosecutor's request, and over Borbon's objection, the trial court adopted CALCRIM No. 361, titled "Failure to Explain or Deny Adverse Evidence." This instruction states as follows:

"If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his

10

failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt.

"If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure." (CALCRIM No. 361.)

The jury deliberated for about one day before returning a unanimous guilty verdict and finding true the allegation that Borbon personally used a firearm.

The court sentenced Borbon to a total of 29 years to life imprisonment: 25 to life for the murder count and four years for the section 12022.5 allegation. The court also gave Borbon zero actual custody credits.

Borbon appealed.

## II

Borbon presents two arguments. The first is the trial court prejudicially erred and violated his substantive due process rights by instructing the jury it could consider his failure to explain or deny the evidence against him. The second is the trial court erred in failing to award him presentence custody credits.

## A

A court should only give an instruction based on CALCRIM No. 361 "when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge." (See *People v. Cortez* (2016) 63 Cal.4th 101, 117.) The reasoning behind the instruction is that a defendant's failure to explain or deny incriminating evidence allows the jury to give additional weight to the evidence against

the defendant.  (*People v. Grandberry* (2019) 35 Cal.App.5th 599, 605.)

The parties agree the trial court erred in giving a CALCRIM No. 361 instruction: when he testified, Borbon denied the evidence against him and offered an alibi for his whereabouts during the night of Mendieta's death.  But the parties dispute the standard by which we should review the error, and whether the error was prejudicial.

Borbon asserts the trial court's giving of the CALCRIM No. 361 instruction violated his federal due process rights because the instruction "made it sound like there were things [he] failed to explain or deny," which allowed the jury to make unwarranted adverse inferences against him.  He argues that because there was no evidentiary support for the instruction, there was no rational way for the jury to draw the kind of adverse inference the instruction permits.  To support his argument, he cites *People v. Pensinger* (1991) 52 Cal.3d 1210, 1243–1244 (*Pensinger*), which he claims stands for the proposition that "instruction on permissive inference violates [a] defendant's due process rights if 'there is no rational way the jury could draw the permitted inference.' "

Borbon's due process argument fails.  The trial court's erroneous decision to give the CALCRIM No. 361 instruction did not automatically result in the jury making unpermitted and irrational inferences against him.  The prosecution presented ample evidence that would permit jurors to draw rational adverse inferences against Borbon: authenticated surveillance footage of his activities on the night Mendieta was killed, and cohesive testimony from multiple investigating officers, along with that of Hurtado and Garibay.  It was not irrational for the jurors to

12

reject Borbon's explanation of the events in the face of the prosecution's evidence. There was no violation of Borbon's due process rights. (See *Pensinger*, *supra*, 53 Cal.3d at p. 1244 [rejecting a defendant's due process claim concerning a jury instruction when there was a rational basis for the jury to infer the defendant's consciousness of guilt].)

We therefore decline Borbon's invitation to review the trial court's error under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24–25. Instead, as the prosecutor notes, the proper standard for us to review the trial court's error is the one from *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). Under the *Watson* standard, we must determine whether it is "reasonably probable that a result more favorable to [Borbon] would have been reached in the absence of the error." (*Id.* at p. 836.)

Borbon argues the court's error was prejudicial even under *Watson* because "the prosecution's case was far from compelling." He lists the following flaws in the prosecution's case: there were no eyewitnesses to or surveillance videos depicting Mendieta's killing; the police never found a murder weapon; Garibay did not recognize the man in the Shell gas station footage; the lack of DNA or other physical evidence connecting Borbon to Mendieta's death; and the lack of motive for Borbon to kill Mendieta. He further claims Hurtado was an unreliable witness because of her criminal record, drug use, and immunity from prosecution in exchange for her testimony.

The prosecution argues the error was harmless. It correctly notes that giving an irrelevant or inapplicable jury instruction is generally a technical error which does not amount to grounds for reversal. (See *People v. Cross* (2008) 45 Cal.4th 58, 67.) And it points out "the trial court gave the jury other

13

applicable instructions that properly supported the jury's decision to disbelieve [Borbon]'s implausible testimony," including the caveat in CALCRIM No. 200 that "[s]ome of the instructions may not apply, depending on your findings about the facts of the case." Specifically, the court instructed the jury it could consider whether a witness "answer[ed the questions] directly," whether the witnesses' testimony was consistent with their prior statements, and whether the witness's testimony was reasonable in light of "all the other evidence in the case."

The prosecution is right. Borbon's alibi was implausible. No other evidence supported his version of the events on March 3 and 4. And while the prosecution's theory of the case did not explain every single detail related to Mendieta's death, there was significant evidence pointing to Borbon's guilt, as detailed above. Video from several locations corroborated Hurtado's testimony, which provided a logical explanation for how Mendieta's dead body was transported from Garibay's shop to Washington Boulevard.

Under these circumstances, it is not reasonably probable that the jury would have reached a result more favorable to Borbon in the absence of the trial court's error. (See *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1473.)

B

Borbon has been in custody since March 2022. Yet the trial court did not award him any presentence custody credits at his sentencing hearing.

The parties correctly agree the trial court erred in failing to give Borbon presentence custody credits. Section 2900.5 entitles Borbon to credit against his term of imprisonment for "all days of custody" before the court imposed his sentence. (See § 2900.5,

14

subd.(a).)  Partial days, such as the day of Borbon's arrest, count towards his calculation of credits.  (See *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48.)  It was the duty of the trial court to determine the total number of days to credit.  (§ 2900.5, subd.(d).)

Borbon asks that we modify his judgment to reflect an award of 744 days of actual presentence custody credits. Including the date of his arrest on March 24, 2022, he was in custody for 744 days before his sentencing hearing on April 5, 2024.  Because the record is clear that Borbon is entitled to 744 days of credit, we resolve the custody credits issue in the interests of economy.  (See *People v Jones* (2000) 82 Cal.App.4th 485, 493.)  We grant Borbon's unopposed request.

## DISPOSITION

The judgment is modified to reflect an award of presentence custody credits of 744 days.  The trial court is directed to prepare an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


WILEY, J.


We concur:


STRATTON, P. J.                    GRIMES, J.


15